## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 22-CR-280-01-BAH |
| | ) | |
| DEVIN ROSSMAN, | ) | |
| | ) | |
| Defendant. | ) | |

### DEFENDANT'S SENTENCING MEMORANDUM

COMES NOW the Defendant, Devin Rossman, through counsel, Ronna Holloman-Hughes, and offers the following in support of a sentence of probation. Based on the parsimony principle and criteria of 18 U.S.C. § 3553(a), a term of probation is "sufficient, but not greater than necessary" to satisfy the statutory objectives of sentencing.

### SUGGESTIONS IN SUPPORT

"It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Pepper v. United States*, 562

1

U.S. 476, 487-488 (2011). 18 U.S.C. § 3553(a) directs a court to impose a sentence that is "sufficient, but not greater than necessary" to satisfy the statutory goals of sentencing enumerated at § 3553(a)(2). This mandate, the parsimony principle, operates to set an "independent limit on the sentence a court may impose." *United States v. Jimenez-Beltre*, 440 F.3d 514, 525-26 n.8 (1st Cir. 2006) (Howard, J., concurring).

Against this backdrop, the court shall consider the 1) "nature and circumstances of the offense, and the history and characteristics" of Mr. Rossman, 2) the need for the sentence to reflect the severity of the offense, to provide deterrence, to protect the public, and to provide Mr. Rossman with educational, vocational, and correctional treatment in the most effective manner, (A-D), 3) the kinds of sentences available, 4) the sentencing guideline range, 5) the sentencing policy statements, 6) the need to avoid unwarranted sentence disparity, and 7) the need to provide restitution.

### A. Mr. Rossman's good faith belief that election fraud had occurred mitigates his culpability and the severity of his offense conduct.

Before January 6, 2021, Mr. Rossman held a good faith belief the 2000 presidential election was in the process of being stolen by Joe Biden and

Democrat operatives. Then President Trump trumpeted this claim to the nation

repeatedly and loudly from the time of the 2020 election to January 6, 2021, and

continues to press that claim today. Even before the election, Trump "repeatedly

used social media, including Twitter and Facebook, to spread false claims of

fraud, going so far as to claim that the only way he could lose the election was if

it was 'rigged.'" Richard L. Hasen, *Identifying and Minimizing the Risk of Election

Subversion and Stolen Elections in the Contemporary United States*, 135 Harv. L. Rev.

F. 265, 269 (April 20, 2022). Trump disseminated over four hundred false claims

of rigged or stolen elections to his supporters via Twitter after the 2020 election.

*Id*. at 269-70. At his January 6 rally, Trump "directed his supporters to the Capitol

after he and other speakers once again claimed a rigged and stolen election and

demanded that Vice President Pence and others do something about it." *Id*. at

275.

       In the months leading to January 6, the Big Lie was amplified by various

right-wing news outlets, such One America News Network (OAN), Newsmax,

and Right Side Broadcasting (RBN).[1]  *Id*. at 270. Between November 3 and

---

[1]  Mr. Rossman relies exclusively on OAN, Newsmax, and RBN because

December 23, Sydney Powell and Rudolph Giuliani appeared on various television shows, such an OAN, Newsmax's *Greg Kelly Reports*, and Fox's *Lou Dobbs Tonight*, claiming Dominion voting machines were designed by three Venezuelans "in order to fix elections" for Hugo Chavez. *US Dominion, Inc. v. Powell*, 554 F.Supp.3d 42, 51-52 (D.D.C. Aug. 11, 2021). Michael Lindell, the founder of My Pillow, appeared on Newsmax and declared "the biggest fraud is the Dominion machines," and claimed Dominion machines "were built to cheat" and "steal elections." *US Dominion, Inc. v. MyPillow, Inc.*, 2022 WL 1597420, at *1 (D.D.C. May 19, 2022). *See also Freeman v. Giuliani*, 2022 WL 1655132, at 2-3 (D.D.C. 2022) (addressing Rudy Giuliani's false narrative spread on social media, podcasts, websites, and OAN that Georgia election workers had committed election fraud).

Trump's false claims were bolstered by our very own elected officials - local, state, and national, including Senator Josh Hawley from Missouri, who infamously raised a clinched fist in faux solidarity with persons gathered outside the Capitol before its breach. Even after the breach of the Capitol, "138

---

mainstream organizations like CNN or Fox News are too biased.

Republican members of the House and seven Republican Senators voted to object to the counting of Pennsylvania's Electoral College votes based on spurious grounds." Hasen, 135 Harv. L. Rev. F. at 274-75.

The lack of evidence of voter fraud has not quelled the beliefs of many Americans that the election was stolen. Over 40% of white persons believe there was some fraud in the election results. 2021 Collaborative Multiracial Post-Election Survey, CMPSurvey (Oct. 5, 2021).[2] For the November 8, 2022 election, 345 candidates on the ballot had expressed election denial beliefs – false claims that the presidential election in 2020 was flawed. The Brookings Institution, E. Kamarck and N. Elsen, *Democracy on the ballot – how many election deniers are on the ballot in November and what is their likelihood of success?* (Oct. 7, 2022).[3] Trump's stolen election claim has become a core article of faith, part of what it means in the contemporary United States to be a Republican with 59% of Republicans and

---

[2] Available at https://cmpsurvey.org/2021/09/23/ucla-led-national-survey-shows-attitudes-about-politics-and-policy-vary-among-racial-groups/ (last accessed Nov. 8, 2022).

[3] Available at https://www.brookings.edu/blog/fixgov/2022/10/07/democracy-on-the-ballot-how-many-election-deniers-are-on-the-ballot-in-november-and-what-is-their-likelihood-of-success/ (last accessed Nov. 8, 2022).

Republican-leaning independents "believing Donald Trump won the 2020 election." Hasen, 135 Harv. L. Rev. F. at 280-81. Among Republicans, 78% say Biden did not win and 54% believe there is solid evidence of that although no such evidence exists. *Id*. at 281.

The United States is experiencing an era of "extreme political polarization," and there may be no single individual more responsible for that polarization than Trump. Franks, AS; Hesami, F, *Seeking Evidence of The MAGA Cult and Trump Derangement Syndrome: An Examination of (A)symmetric Political Bias*, Societies 2021, 11, 113 at p.1[4] Research demonstrates his supporters "experience motivated social cognition to adopt his position on issues," and "the higher level of Trump support, the higher the level of bias." *Id*. at 6. Across three studies, research demonstrates Trump's supporters "consistently shifted their attitudes to more closely match ostensible opinions and the real-life interests of Trump." *Id*. at 12. In one study, researchers found "nearly half of Trump voters were willing to subvert democracy to some degree in order to benefit Trump." *Id*. Such results lend credence to "accusations that some Trump supporters have a

---

[4] Available at https://doi.org/10.3390/soc11030113

cult-like loyalty" to him. *Id*. A cult can "catalyze the formation of "shared

psychotic disorder" because it involves a dominant, charismatic leader who

dictates the beliefs, actions, and behaviors of followers. Brian Holoyda, MD,

MPD, and William Newman MD, *Between Belief and Delusion: Cult Members and

the Insanity Plea*, 44 Journal of the American Academy of Psychiatry and the Law,

p. 53 (2016). *See also* Joshi, KG, Frierson RL, Gunter TD, *Shared psychotic disorder

and criminal responsibility: a review and case report of folie a trois*, Journal of

American Academy of Psychiatry and the Law, 34: 511-517 (2006).

Mr. Rossman maintained similar cult-like beliefs before January 6, 2021

and those beliefs exclusively motivated his offense. Those beliefs were based on

the statements of Trump himself, various news outlets on television and the

internet, social media, and elected government officials. The court has not only

the authority, but the duty to consider the mitigating nature of these beliefs when

sentencing Mr. Rossman.

Society has long recognized a defendant that commits an offense

attributable to mental problems, such as a delusional belief system, may be less

culpable than other defendants. *California v. Brown*, 479 U.S. 538, 545 (1987)

(O'Connor, J., concurring). A defendant's susceptibility to delusional thinking

mitigates the severity of the offense and justifies leniency. *Cf. Ford v. Wainwright*,

477 U.S. 399, 409-10 (1986) (execution of mentally ill frustrates retributive goal of

sentencing and promotes disrespect for the law). The Sentencing Guidelines

authorize a district court to depart downward if a defendant's diminished

contributed to the commission of the offense. U.S.S.C. § 5K2.13. Likewise, the

sentencing criteria at 18 U.S.C. § 3553(a) directs a court to consider the individual

circumstances and history of Mr. Rossman.

Based on these authorities, Mr. Rossman's good faith belief the 2020

presidential election was fraudulent mitigates his culpability and the severity of

his offense conduct. Even though his beliefs regarding election fraud were ill-

informed, Mr. Rossman's underlying motivation was to preserve the integrity of

the 2020 presidential election. From this factually flawed perspective, Mr.

Rossman's willingness to follow Trump's explicit directive on January 6 to march

on the Capitol is comparable to a misguided act of civil disobedience.

Historically, civil disobedience "has been important to this country's

political development, alerting the majority to injustices and unwise policies."

*See* Note, *The State Made Me Do It: The Applicability of the Necessity Defense to Civil Disobedience*, 39 Stan.L.Rev. 1173, 1175 (1987). Beginning with the Boston Tea Party and continuing through the antislavery, labor, women's rights, civil rights, antiwar, and antinuclear movements, civil disobedience has been a familiar sight on the American political landscape. *Id*. at 1175-76. *See also United States v. Schoon*, 971 F.2d 193, 196 (9th Cir. 1991) (describing necessity as a utilitarian defense that justifies "criminal acts taken to avert a greater harm, maximizing social welfare by allowing a crime to be committed where the social benefits of the crime outweigh the social costs of failing to commit the crime").

Mr. Rossman took a bus to Washington D. C. to participate in the Stop the Steal rally. Mr. Rossman attended the rally at which Trump implored its attendees to march on the Capitol. And like many others, Mr. Rossman marched to the Capitol where he committed the offense of parading, demonstrating, or picketing in a Capitol building. A prison sentence is unwarranted and unjust under such circumstances.

**B. An application of the criteria of 18 U.S.C. § 3553 to Mr. Rossman's case demonstrates a term of probation is "sufficient, but not greater than necessary" to satisfy the statutory objectives of sentencing.**

Mr. Rossman has taken full responsibility for his actions since his arrest and has taken measures to ensure he does not reoffend. Although it has yet to promulgate any standards or recommendations regarding a defendant's individual characteristics, the Sentencing Commission has found some are directly linked to recidivism. *See Rita v. United States*, 127 S. Ct. 2456, 2473 (2008) (Stevens, J., concurring). According to these findings, the best candidates to not recidivate are those with a good history of employment, employment at the time of sentencing, a stable living situation, and have no criminal history or history of substance abuse. U.S.S.C., *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, 12-14 (May 2004). *See United States v. Ruff*, 535 F.3d 999, 1001-02 (9th Cir. 2008) (variance from 30-37 guideline range to one day confinement and twelve months of community confinement was reasonable based on defendant's strong employment record, low risk of recidivism, and need for restitution). Nearly all of these factors are present in Mr. Rossman's case.

### 1. Mr. Rossman has a good history of employment and will remain employed at the time of sentencing.

In October 2016, Mr. Rossman was hired by Home Depot as a measure

tech – measuring floors to prepare for flooring installation. He was a full-time employee and only resigned in October 2021 due to the company's Covid-19 mandates. However, a few days after resigning from Home Depot, Mr. Rossman was hired by the company "Mr. Handyman" where he is still employed. He earns a monthly income of approximately $5,000 and his duties include, but are not limited to, drywall repairment, painting, and minor construction. Mr. Rossman has been working and supporting himself since he was 16 years old and has continued to do so today. Mr. Rossman has a good history of employment, and will remain employed up to his sentencing date.

**2. Mr. Rossman lives in a stable environment.**

Mr. Rossman lives alone in a safe and stable home where he pays his own bills. He has been a resident at 19506 E 5th Street Court North, Independence, Missouri, 64056 for over a year and has never had issues surrounding his living arrangements. The home is in a cul-de-sac where neighbors are social and friendly, and the environment is conducive for Mr. Rossman's growth.

**3. Mr. Rossman's criminal history is dated, nonviolent, and does not evince a need for incarceration to protect the public.**

Aside from this case, Mr. Rossman has not been arrested, charged or

convicted of any crimes since 2005. His criminal history shows that while he has

been arrested and charged for several driving violations and for minor drug

possessions, it has been over 15 years since his last arrest. To put things into

perspective, Mr. Rossman is now 38 years old and before this case, had

committed no crimes since the age of 21.

Based on the forgoing, Mr. Rossman has a low likelihood of recidivating,

he has learned from his wrongs, and is not a danger to the community. A term of

probation is appropriate under such circumstances. Probation is an alternative

sentence to imprisonment that remains sufficiently punitive to provide

deterrence and promote respect for the law. The court could also include a term

of community or home confinement as a condition of probation, which would act

as a further punitive measure beyond the numerous conditions that substantially

restrict a person's liberty. *See Gall v. United States*, 128 S. Ct. 586, 595-96 (2007)

(such persons may not leave the judicial district without permission from the

supervising officer, must regularly report to that officer, must permit

unannounced visits at home or work, must not associate with other persons with

felony convictions, and must follow any other special condition that a court finds

appropriate). Such conditions regulate significant facets of a person's daily life. *Id*. (citing Advisory Council of Judges of National Council on Crime and Delinquency, Guides for Sentencing 13-14 (1957)).

Imposing a non-custodial alternative to a prison sentence also decreases the risk of recidivism. *See* Sentencing Project, *Incarceration and Crime: A Complex Relationship*, 7-8 (2005) (the "rapid growth of incarceration" has had a "profoundly disruptive" and destabilizing effect on "family and community bonds" and contributes to "an increase in recidivism and future criminality"). Based on the § 3553 factors and the low risk of Mr. Rossman's recidivism, a probationary term satisfies the statutory directive to impose a sentence "sufficient, but not greater than necessary" to promote the sentencing goals specified at 3553(a)(2). *See Gall*, 128 S. Ct. at 596 n.6 (parsimony principle applies to second factor of 3553(a)).

**4. Mr. Rossman's offense conduct included no violence or threats of violence to other people.**

While Mr. Rossman's conduct was disorderly and disruptive, it included no violence or threats of violence to others. Mr. Rossman is not a violent person, and neither was the nature of this offense. He unlawfully entered the United

13

States Capitol solely to protest what he in good faith believed was a rigged election. Once he entered the Capitol, his actions remained consistent with that concern. He did not cause harm to anyone, he destroyed no property, and neither did he take any property from the Capitol. Therefore, Mr. Rossman is not a threat to the society and should not be viewed as such.

WHEREFORE, Mr. Rossman requests the court to impose a sentence of probation.

Respectfully submitted,

_s/Ronna Holloman-Hughes_
RONNA HOLLOMAN-HUGHES
Assistant Federal Public Defender
Walnut Street, Suite 600
Kansas City, MO 64106
(816) 471-8282
ronna_holloman-hughes@fd.org

## CERTIFICATE OF SERVICE

It is CERTIFIED the foregoing was electronically filed on this 22nd day of November 2022, and that all parties received a copy under the ECF system.

_s/Ronna Holloman-Hughes_
RONNA HOLLOMAN-HUGHES

14