**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:22-cr-280 (BAH)** |
| **v.** | : | |
| | : | |
| **DEVIN KIEL ROSSMAN,** | : | |
| | : | |
| **Defendant** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Devin Kiel Rossman to 90 days' incarceration, 36 months' probation, 60 hours community service, and $500 restitution.

## I.     Introduction

Defendant Devin Kiel Rossman, a 38-year-old handyman, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than $2.8 million in losses.[1]

Defendant Rossman pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building. As explained herein, a sentence of

---

[1] Although the Statement of Offense in this matter, filed on September 9, 2022, (ECF No. 22 at ¶ 6) reflects a sum of more than $1.4 million for repairs, as of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

incarceration is appropriate in this case because Rossman: (1) entered the Capitol building through the Senate Wing door at approximately 2:19 p.m., just minutes after the initial breach at 2:12 p.m.; (2)   remained in the Capitol building for approximately 1 hour and 53 minutes; (3) traveled throughout the Capitol, including through the Crypt, eventually reaching the Speaker's Office suite, a sensitive location in the Capitol where entry is restricted even when the Capitol as a whole is open to the public; (4) entered the Speaker's Office suite and tried to open doors while the Speaker's terrified staffers sought shelter under their desks; (5) took photographs and bragged to friends in Facebook messages about entering the Speaker's Office suite; (6)  did not acknowledge at his guilty plea hearing that he saw any signs that the Capitol building was closed to the public on January 6, 2021 despite his early entry into the building just after the initial breach, and despite having been in an area on the lower West terrace where he would have witnessed clashes between police protestors, would have seen that the window next to the Senate Wing door was smashed, and would have heard an alarm blaring as he passed through the Senate Wing door; and (8) has expressed little remorse for his actions.

The Court must also consider that Rossman's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who trying to prevent a breach of the Capitol building, and disrupt the proceedings. Here, the facts of and circumstances of Rossman's crime support a sentence of 90 days' incarceration, 36 months' probation, 60 hours community service, and $500 restitution in this case.

## II.    Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 22 (Statement of Offense), ¶¶ 1-7.

*Defendant Rossman's Role in the January 6, 2021 Attack on the Capitol*

On January 6, 2021, Devin Rossman traveled to Washington, D.C., from his home in Missouri to attend the "Stop the Steal" rally. Prior to leaving Missouri, Rossman discussed plans with other individuals on Facebook to bring firearms and knives to Washington, D.C. *See* ECF 22 ¶ 9. In one conversation, Rossman sent a picture of three knives and stated on January 5, 2021 that he intended to conceal the knives, "one for my boot, one for my waist and one for my pocket." *See id.* He also texted pictures of firearms that he intended to bring to Washington, D.C.[2] *See id.*

After attending the former President's rally, Rossman travelled by foot to the U.S. Capitol, arriving to the lower West terrace at around 2 p.m. *See id.* ¶ 10. He joined a mob of protestors on the lower West terrace. *See id.* ¶ 11. Shortly thereafter, Rossman proceeded up to the area of the Northwest side of the Capitol building. *See id.* Image 1, below, is a selfie Rossman took outside of the Senate Wing door:

***Image 1***



---

[2] At his plea hearing and a subsequent interview with the FBI, Rossman stated that he ultimately decided against taking these items to D.C. The government has no information that Rossman brought the referenced weapons with him to D.C. on January 6, 2021.

Rossman entered the Capitol building through the Senate Wing door at approximately 2:19 p.m., just seven minutes after it was initially breached. *See id.* ¶ 12. Once inside, he walked south inside the Capitol building toward the Crypt and then walked south through the Crypt with a large crowd of people. *See id.* Rossman then made his way to the Speaker's Office suite. Image 2, below, is still image from CCTV video showing Rossman in the hallway outside H227 with a group of protestors at 2:32 p.m.[3]:

***Image 2***



Congressional staffers were hiding in a conference room in the Speaker's Office suite at the time protestors arrived on January 6, 2021.[4] Henry Connelly, head of communications for House Speaker Nancy Pelosi, recalled that staffers barricaded themselves in a nearby conference room while rioters occupied other offices in the suite.[5] Connelly recalled, "We were huddled in

---

[3] On January 6, 2021, there was a 5-hour difference between UTC time and EST in Washington, D.C.

[4] *See* Jazmine Ulloa, *'I didn't think I was going to go home that day': Congressional staffers recall the lingering trauma of the Jan. 6 attack*, The Boston Globe, available at: https://www.bostonglobe.com/2022/01/04/nation/behind-scenes-scene-crime-congressional-staffers-recall-lingering-trauma-jan-6-attack/ (Last visited Nov. 4, 2022).

[5] *See id.*

the dark, listening to the screams of people trying to find our boss." Leah Han, another Pelosi staffer recalled staffers crouching under a table as the protestors entered the Speaker's Office suite: "I was thinking, 'If they find us are they going to keep us hostage? Are they going to . . . torture us? . . . Am I going to get raped? . . . Am I going to get shot? Do they have weapons?' I didn't think I was going to go home that day."[6]

Rossman contributed to the fears of Pelosi staffers. He can be seen on CCTV in Image 3, below, checking locked doors shortly after entering the Speaker's Office Suite at 2:32 p.m.:

*Image 3*



---
[6] *See id.*

A video taken by another protestor shows Rossman enter a conference room in the Speaker's Office suite where a laptop is open. *See* ECF 20, item #2. Protestors around Rossman can be heard on the video chanting, "Nancy, where are you?", "We've got something to say," "Here's Johnny," "Where are you?", "Who's going to hack it?" in reference to the open laptop, "they ran out of here" in reference to the office occupants, and "You scared little democrat …", among other things. Glass can be heard shattering while Rossman is still in the conference room. Rossman can be seen in the video with his camera phone out, taking pictures. Image 4, below, is a still from the video:

*Image 4*



Rossman was in the Speaker's Office suite from approximately 2:32 p.m. until approximately 2:40 p.m. After leaving the conference room, Rossman exited to the Speaker's balcony where he continued taking photographs, including image 5, below:

*Image 5*



Photo ID 419379129409550

According to Geofence data, Rossman stayed inside the Capitol building for a total of one hour and fifty-three minutes or from 2:19 p.m. until approximately 4:13 p.m. ECF 22 ¶ 12.

*Rossman's Social Media*

Rossman sent Facebook messages to his friends from inside the Capitol building. *See* ECF 22 ¶ 13.  Rossman received a message on Facebook stating, "all over the computer capitol was stormed, u ok?" At 2:50 p.m., Rossman replied, "I'm in it". *See id*. On January 8, 2022, Rossman sent Facebook private messages telling friends that he went into the Speaker's Office suite: "the office we found open was pelosis with her laptop open . . . thats pelosis office and her 4 tv screens

. . . that was me walking in her office . . . STOP THE STEAL". *See id*. Rossman sent the following

pictures (images 6 and 7) to various recipients through Facebook:

*Image 6*



*Image 7*



After the riot was over, Rossman privately messaged "Tear gas today" to a friend on Facebook. While Rossman was on his way back to Missouri, Rossman messaged a Facebook friend in reference to the events of January 6, 2021, and stated, "Today may of been a call to arms . . . Keep watching whats going on. I may be back to d.c. in a few days."  On January 11, 2021, a Facebook friend told Rossman that she saw him on a video that was played on the news, and stated to Rossman, "I saw you!! . . . You better hope the FBI didn't." Rossman replied, "yeah no s**t." The friend responded, "You can come hide at our house if you need to." Rossman replied, "thanks." On June 23, 2022, a Facebook friend inquired as to whether Rossman was in criminal trouble and how much jail time he was facing. Rossman responded, "i didn't do anything wrong."

*Rossman's Interview with the FBI*

On September 29, 2022, the FBI debriefed Rossman pursuant to the plea agreement in this case. Rossman stated that upon his arrival at the U.S. Capitol building on January 6, 2021 following the former President's speech, he went up the stairs outside of the building and entered through what he believed were the main doors. He stated that the doors were open and there were already a lot of people inside. Rossman had his phone with him and took video at different times inside the Capitol.[7] While inside the building, he noticed most of the office doors were closed and, while he was upstairs, he saw that House Speaker Pelosi's office door was open and people were going inside. Rossman stated that he went through the door, walked inside her office, into another adjoining room, and out the other side. While inside the Speaker's Office, he did not see anyone take anything. Rossman stated another protestor picked up a Candle holder and was about to break some glass, but somebody else in the room stopped him. He did not have plans to go inside the

---

[7] The United States requested that Rossman voluntarily surrender his phone upon arrest. However, the phone was never surrendered.

building but got caught up in the moment. Rossman advised that he wandered around the U.S. Capitol for awhile and believes he called his father and mother while inside. Just prior to leaving the U.S. Capitol, Rossman went outside to a balcony that overlooked the U.S. Capitol grounds, which is where pictures of him outside on a balcony were taken. Rossman left the U.S. Capitol through the same door he entered.

<em>The Charges and Plea Agreement</em>

On May 12, 2022, the United States charged Rossman by criminal complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On May 16, 2022, law enforcement officers arrested him in Kansas City, Missouri. On August 17, 2022, the United States charged Rossman by a four-count Information with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On September 9, 2022, pursuant to a plea agreement, Rossman pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G). By plea agreement, Rossman agreed to pay $500 in restitution to the Department of the Treasury.

## III.   Statutory Penalties

Rossman now faces a sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment and a fine of up to $5,000. The defendant must also pay restitution under the terms of his or her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.     Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of a sentence of 90 days' incarceration, 36 months' probation, 60 hours community service, and $500 restitution in this case.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Rossman's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Rossman, the absence of violent or destructive acts is not a mitigating factor. Had Rossman engaged in such conduct, he or she would have faced additional criminal charges.

One of the most important factors in Rossman's case is exactly where he traveled and the length of time inside of the building. Rossman entered the building through the Senate Wing door at 2:19 p.m., just minutes after the initial breach at 2:12 p.m. and stayed inside of the Capitol

building for a very long time: one hour and fifty-three minutes in total. He wandered throughout the halls of the building, into the Crypt and through the Speaker's Office suite at a time when staffers were sheltering in a conference room in fear of being attacked.

Another important factor in this case is whether the defendant sincerely demonstrated genuine remorse for his conduct on January 6. Rossman has not expressed significant remorse for his actions. He does not seem to grasp that there were terrified staffers hiding from him and the group of protestors that entered the Speaker's Office suite on January 6, 2021. Instead, he bragged to his friends in private messages that he had made it that far into the interior of the building.

Perhaps more pointedly, Rossman has been reluctant to acknowledge that he had any indication that the Capitol was closed to the public on January 6. Rossman was on the lower West terrace of the restricted grounds starting at about 2 p.m. Rioters were clashing with law enforcement outside of the building at that time. He then entered through the Senate Wing door at 2:19 p.m. Rossman would have seen that a window next to the door had been broken and shattered by protestors and would have heard alarms sounding as he passed through the door. Despite all of these facts, Rossman has had difficulty acknowledging that he knew that he should not have entered the building. At his guilty plea hearing and his FBI debrief interview just a few months ago, Rossman had trouble acknowledging that he knew the U.S. Capitol building was closed when he entered. This indicates a lack of genuine remorse.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B.  The History and Characteristics of Rossman

As set forth in the PSR, Rossman's criminal history consists of a slew of drug and alcohol-related misdemeanor convictions and arrests when he was age 18-20. ECF 29 ¶¶ 26-36. Rossman

graduated high school and is currently employed full-time as a handyman. *See id*. ¶¶ 55-56. He has never been married and has no children. *See id*. ¶ 41.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Rossman's apparent lack of acceptance of responsibility and genuine remorse demonstrate the need for specific deterrence for this defendant. Rossman has yet to fully acknowledge the factual circumstances surrounding his illegal entry into the Capitol building or that the staffers hiding from protestors in the Speaker's Office suite were terrified as the group of protestors that included Rossman made their way through the Speaker's offices.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[8] This Court must sentence Rossman based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Rossman has pleaded guilty to Count Four of the Information, charging him with Parading, Demonstrating, or Picketing in the Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). Although unwarranted disparities may "result when the court relies on things like alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants

---

[8]  Attached to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted. *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences." Consequently, Section 3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than codefendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan)

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012).

The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. It follows that a sentencing court in a Capitol siege petty offense case is not constrained by sentences previously imposed in other such cases. *See United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out, you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. For that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences. The statutory range of for a petty offense is zero to six months. Given that narrow range, a sentence of six months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom. *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr.  at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense. And that's largely been

accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71 (ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his exposure substantially and appropriately.") (statement of Judge Berman Jackson); *United States v. Peterson*, D.D.C. 21-cr-309, Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar).

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, other judges of this court have sentenced Capitol breach defendants who spent time in other sensitive places within the Capitol. A defendant's entry into a sensitive space, such as the Senate Floor or a member's office, places that defendant in a more serious category of offenders than defendants who remained in hallways or central, more public spaces, such as the Rotunda. A defendant who entered a sensitive space took an extra step to occupy the Capitol and displace Congress and to display the dominance of the mob over the will of the people. That person's presence is even more disruptive. An unauthorized individual in a private office poses a greater threat and creates a greater impediment to members of Congress and staffers just trying to do their jobs than would a trespasser passing through a hallway.

One of the most famous photographs from January 6 is that of a rioter in Speaker Pelosi's office, with his feet on her desk. *See* Amended Complaint, *United States v. Richard Barnett,* 21-cr-38, ECF No. 3, at 2. That photograph has become notorious likely for exactly this reason, because of what invading the office of a member of Congress represents: a show of intimidation, an attempted display of power, above and beyond entering the building.[9]

---

[9]   Barnett is pending trial, scheduled for December 12, 2002.

In sentencing Rossman, this Court may wish to consider the sentences imposed on multiple other defendants who, like Rossman, entered a sensitive area, in particular, Speaker Pelosi's Office suite.  For example, in *United States v. Virginia Spencer,* 21-cr-00147-002 (CKK), the defendant and her husband, like Rossman, entered the Capitol near the breached Senate Wing door at 2:19 p.m., just minutes after the initial breach of that door at 2:12 p.m.  They joined the crowd that surged past the police trying to hold back rioters in the Crypt; went to Speaker Pelosi's Office suite; joined another crowd that formed outside of the House Chamber that attempted to enter the Chamber while lawmakers were still trapped inside; and witnessed violence against police but continued to participate in the riot, remaining in the Capitol approximately 30 minutes in total. Additionally, Spencer minimized her conduct to the FBI when interviewed.  Spencer and her husband also engaged in a verbal and physical altercation with a counter-protestor on their way to the riot, and they brought their 14-year-old child inside the Capitol.  Spencer had a single prior conviction for a misdemeanor drug offense and had spent a day in jail for a traffic infraction. Rossman's conduct in this case resembles Spencer, and Judge Kollar-Kotelly sentenced Spencer to 90 days' incarceration.

In *United States v. Derek Jancart and Erik Rau*, 21-cr-148 (JEB) and 21-cr-467 (JEB), the defendants pled guilty to misdemeanor charges of 40 U.S.C. § 5104(e)(2)(D) (Disorderly Conduct in the Capitol Building) in connection with penetrating the Capitol building all the way to the Speaker's Conference Room. Judge Boasberg sentenced the defendants each to 45 days of incarceration. A misdemeanant who reached the Senate Floor, even though she did not appear to have known where she was, also received a sentence of incarceration. *United States v. Courtright,* No. 21-cr-72 (CRC) (30 days' incarceration, one year supervised release).

Like *Jancart* and *Rau*, Andrew Ericson went to the Speaker's Conference Room; he posed for a selfie there, as well as for as a photograph resting his feet on the conference table. Gov. Sentencing Mem., *United States v. Andrew Ericson,* 21-cr-506 (TNM), ECF No. 37 at 3. Ericson posted his involvement to social media. *Id.* at 4. Ericson was aware of the crowd outside. *See id.* at 3, 7-8, 13. The government recommended 60 days' jail time, and Judge McFadden imposed a sentence of 20 days' imprisonment, discussing the defendant's entry into an office as follows: "That's a private area and your violation of that space suggests a certain brazenness and intentionality that requires consideration in your sentence. You could have caused a very dangerous and fearful scene had the speaker or her staff been present in the office when you and others entered it." *Ericson,* Tr. 12/10/21 at 21. Judge McFadden concluded that entering offices put Ericson in a "different category" than people "who were only in areas that would normally be open for tours." *Id.*

In *United States v. Matthew Mazzocco*, 21-cr-54 (TSC), the defendant pled guilty to a misdemeanor charge of 40 U.S.C. § 5104(e)(2)(G) (parading, demonstrating or picketing in a Capitol building) in connection with spending time inside the Spouse's Lounge of the Capitol, and Judge Chutkan sentenced the defendant to 45 days of incarceration. While inside the Spouse's Lounge, Mazzocco warned others not to take or destroy anything and said that they were probably going to get in trouble for what they were doing Gov. Sentencing Mem., *Mazzocco*, 21-cr-54, ECF No. 28 at 6. Mazzocco took smirking photographs of himself during the riot. *Id.* at 2, 12. He was also aware of the crowd outside the Capitol and entered through the Senate Wing Door . *See id.* at 3, 7-8, 13.

In *United States v. Stackhouse*, 21-cr-240 (BAH), this Court sentenced the defendant to 36 months' probation with a condition of a total of 14 days' intermittent confinement and 90 days of

home detention for his Section 5104(e)(2)(G) conviction, although the government had sought a sentence of 45 days' incarceration.  Like Rossman, Stackhouse traveled through the Capitol, including the Crypt and Rotunda, eventually reaching the Speaker's Office suite.  There, someone kicked open the door to the suite, and ten seconds later, Stackhouse entered the suite.  At that time, the Speaker's staffers were in their offices hiding under their desks.  But Stackhouse was in the Capitol for 20 minutes, while Rossman was in the Capital for almost two hours; Stackhouse was in the Speaker's suite for 40 seconds, while Rossman was in the Speaker's suite for approximately eight minutes and Stackhouse did not take photos inside the Speaker's suite and send them to friends on Facebook, while Rossman did both of those things.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

### V.     The Court's Authority to Impose Imprisonment as a Condition of Probation or as a Split Sentence.

In 18 U.S.C. § 3563, Congress set out "[c]onditions of probation."  18 U.S.C. § 3563. Among the discretionary conditions of probation a sentencing court may impose is a requirement

that a defendant

> remain in the custody of the Bureau of Prisons during nights, weekends or other intervals of time, totaling no more than the lesser of one year or the term of imprisonment authorized for the offense, during the first year of the term of probation or supervised release.

18 U.S.C. § 3563(b)(10).  Congress enacted this provision to give sentencing courts "flexibility" to impose incarceration as a condition of probation in one of two ways.  S. Rep. No. 225, 1983 WL 25404, at *98.  First, a court can direct that a defendant be confined in "split intervals" over weekends or at night.  *Id.*  Second, a sentencing court can impose "a brief period of confinement" such as "for a week or two."  *Id.*[10]

Section 3563(b)(10) authorizes a sentencing court to impose one or more intervals of imprisonment as a condition of probation.  18 U.S.C. § 3653(b)(10).  Section 3563(b)(10) authorizes sentencing courts to impose up to a year (or the authorized statutory maximum) of imprisonment, which the defendant must serve during the first year of probation.  *Id.*  Thus, for a violation of 40 U.S.C. § 5104(e)(2)(G), Section 3563(b)(10) facially permits a sentencing court to require the defendant to serve up to six months in prison as a condition of probation.  *See* 40 U.S.C. § 5109; 18 U.S.C. § 3563(b)(10).  Any imprisonment term imposed as a condition of probation must be served during "nights, weekends or other intervals of time." § 3563(b)(10).

Although the statute does not define an "interval of time," limited case law suggests that it should amount to a "brief period" of no more than a "week or two" at a time.  *United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history described above and reversing magistrate's sentence that included

---

[10] Section 3563(b)(10)'s legislative history notes that imprisonment as a term of probation was "not intended to carry forward the split sentence provided in Section 3561, by which the judge imposes a sentence of a few months in prison followed by probation."  S. Rep. No. 225, 1983 WL 25404, at *98.

30-day period of confinement as a condition of probation); *accord United States v. Baca*, No. 11-1, 2011 WL 1045104, at *2 (C.D. Cal. Mar. 18, 2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation was inconsistent with Section 3563(b)(10)); *see also United States v. Anderson*, 787 F. Supp. 537, 538 (D. Md. 1992) (continuous 60-day incarceration not appropriate as a condition of probation); *United States v. Forbes*, 172 F.3d 675, 676 (9th Cir. 1999) ("[S]ix months is not the intermittent incarceration that this statute permits."). Accordingly, a sentence of up to two weeks' imprisonment served in one continuous term followed by a period of probation is permissible under Section 3563(b)(10).

Typically known as "intermittent confinement," a sentencing court may impose multiple intervals of imprisonment under Section 3563(b)(10). *See Anderson*, 787 F. Supp. at 539. Section 3563(b)(10) thus authorizes this Court to impose more than one imprisonment interval, where each such interval is no more than 14 days. *See, e.g.*, *United States v. Cameron*, 22-cr-17 (TFH), ECF No. 36 (D.D.C. Aug. 17, 2022) (imposing 30-day imprisonment sentence (ten three-day intervals) and three years of probation); *United States v. Vuksanaj*, 21-cr-620 (BAH), ECF No. 43 (D.D.C. Apr. 29, 2022) (imposing 42-day imprisonment sentence (three 14-day intervals) and three years of probation); *United States v. Reed*, 21-cr-204 (BAH), ECF No. 177 (D.D.C. Apr. 14, 2022) (same); *United States v. McCreary*, 21-cr-125 (BAH), ECF No. 46 (D.D.C. Apr. 1, 2022) (same); *United States v. Howell*, 21-cr-217 (TFH), ECF No. 41 (D.D.C. Mar. 8, 2022) (imposing 60-day imprisonment sentence (six 10-day intervals) and three years of probation); *United States v. Schornak*, 21-cr-278 (BAH), ECF No. 71 (D.D.C. Feb. 18, 2022) (imposing 28-day imprisonment sentence (two 14-day intervals) and three years of probation). Imposing an intermittent confinement sentence with 90 days of imprisonment as a condition of probation is appropriate in this case.

To be sure, earlier in the investigation of the January 6 attack on the Capitol, the government refrained from recommending intermittent confinement sentences given the potential practical and logistical concerns involved when an individual repeatedly enters and leaves a detention facility during an ongoing global pandemic.  At this point, however, multiple jury trials have successfully occurred, *see* Standing Order No. 22-64 (BAH), at 3 (D.D.C. Nov. 9, 2022) (noting that the Court has "forg[ed] ahead" and eas[ed] the backlog" of criminal cases since the Omicron surge began to abate in February 2022), and general COVID trends appear to show a decrease in cases.[11]

## VI.   A sentence imposed for a petty offense may include both imprisonment and probation.

The government's recommended sentence 90 days' incarceration, 36 months' probation, 60 hours community service, and $500 restitution is also permissible under 18 U.S.C. § 3561(a)(3). As Judge Lamberth observed, Section 3561(a)(3) "permits a sentencing judge to impose a term of probation at the same time as a term of imprisonment when a defendant is sentenced to imprisonment for only a petty offense or offenses."  *Little*, 590 F.Supp.3d at 351; *see generally* Appellee's Brief for the United States, *United States v. Little*, No. 22-3018 (D.C.) (filed Aug. 29, 2022).  Because the government has briefed a sentencing court's authority to impose a split sentence for a defendant convicted of a single petty offense in this Court and the D.C. Circuit, those arguments are not elaborated further here.[12]

---

[11] *See* Centers for Disease Control and Prevention, COVID Data Tracker, *available at* https://covid.cdc.gov/covid-data-tracker/#datatracker-home (last viewed Nov. 21, 2022).

[12] The defendant's appeal of the split sentence imposed in *Little* is pending.  The D.C. Circuit heard oral argument on November 2, 2022.

## VII.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to 90 days' incarceration, 36 months' probation, 60 hours community service, and $500 restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

           Respectfully submitted,

           MATTHEW M. GRAVES
           United States Attorney
           D.C. Bar No. 481052

By:    */s/ Andrew J. Tessman*
           ANDREW J. TESSMAN
           Assistant United States Attorney
           District of Columbia – Detailee
           West Virginia Bar No. 13734
           300 Virginia Street
           Charleston, WV 25301
           (304) 345-2200
           Andrew.Tessman@usdoj.gov